EDWARD P. MURRAY
*vs.*
JANE MURPHY SULLIVAN, ET AL.

Penobscot.   Opinion, March 25, 1962

*Gerald E. Rudman,* for plaintiff.

*Michael Pilot,*
*James E. Mitchell,*
*Hutchinson, Pierce, Atwood & Allen,*
    *by Vincent McKusick*
*Verrill, Dana, Walker, Philbrick & Whitehouse,*
                                    for defendants.

SITTING: WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.
    WILLIAMSON, C. J., did not sit.

WEBBER, J.   On report.   By his will executed on February 21, 1906 the late John Cassidy first created a trust for the benefit of his five children and their lineal descendants which should endure until the death of the last surviving child.   He then disposed of the remainder of his estate in these terms:

"Upon the termination of this trust, as aforesaid, namely, after the decease of all of my said five named children, all my estate in whatever form the estate shall then be, shall then vest in and become the property of all of my lineal descendants, if any, then living, in the same manner and in the same proportions as shall then be provided by the then existing laws of the State of Maine for the descent among lineal descendants of intestate property, real and personal."

The testator died on March 25, 1918, leaving no widow and survived by four of his children, James, Mary, John F. and Lucy, and a grandchild, Edythe Rice Dyer.   The latter is the only child of the testator's daughter Rosella who had predeceased her father on May 25, 1915.   The trust terminated upon the death of Lucy on June 9, 1961.   The lineal descendants of the testator in the nearest degree then com-

prised the six grandchildren who are claimants here, the said Edythe Rice Dyer, Jane Murphy Sullivan, only child of Mary, and Roselle M. Flynn, Joan Stetson, Barbara Anne Cassidy and John Cassidy III, the last four being the children of John F. Cassidy.

The applicable statute, incorporated by reference into the will, is R. S., 1954, Chap. 170, Sec. 1, Subsec. II which provides:

> "II. The remainder of which he dies seized, and if no widow or widower, the whole shall descend in equal shares to his children, and to the lawful issue of a deceased child by right of representation. If no child is living at the time of his death, to all his lineal descendants; equally, if all are of the same degree of kindred; if not, according to the right of representation."

The parties agree that the six grandchildren are the persons to whom the trustee must distribute the corpus of the estate in the discharge of the responsibilities imposed upon him by the will. They agree that the plaintiff trustee requires the guidance of the court in making final distribution. They disagree only as to the size of the share each claimant should receive. Mrs. Sullivan and Mrs. Dyer, hereinafter called for convenience the proponents, contend that since the testator had children living at his death, the first sentence of the quoted portion of the statute is controlling and that the grandchildren should take as the "lawful issue of a deceased child by right of representation." In short, the two proponents would each take one-third while the four opponents would each take one-twelfth. The opponents assert that the statute should be applied as of the moment immediately following the death of the last surviving child so that by application of the second sentence of the quoted portion of the statute each grandchild would take *per capita* one-sixth of the remainder.

All parties to this controversy agree upon certain fundamental principles of will construction frequently enunciated in prior decisions of this court. "It is the intention of the testator which must prevail in the construction of a will. But that intention must be found from the language of the will read as a whole illumined in cases of doubt by the light of the circumstances surrounding its making." *Cassidy, Guardian* v. *Murray, Trustee*, 144 Me. 326, 328. Since we seldom find an exact duplication in the phraseology of those wills which come before the courts for interpretation, we are not often greatly aided by prior judicial decisions involving the construction of other wills. *New England Trust Co., et al.* v. *Sanger, et al.*, 151 Me. 295, 303; *Berman* v. *Shalit*, 152 Me. 266, 268. In Maine there is no judicial inclination to prefer either a *per capita* or a *per stirpes* distribution. *Mellen* v. *Mellen*, 148 Me. 153, 159. There is further agreement that, whatever the respective shares of the ultimate takers, the remainder did not vest in them until after the death of the testator's last surviving child — such having been provided by the language of the will with great care and particularity.

The proponents vigorously contend that the intention of the testator to follow a *stirpital* testamentary pattern is clearly evidenced by the language of the trust clause providing for support payments for his children and their lineal descendants. This clause provides:

"During the continuance of this Trust, the Trustees of my estate shall provide for the comfortable support and maintenance of each and all of my said five children (naming them), during the life of each of them, and at the decease of each of them, then to all the lineal descendants together, if any, of each of them, a sum, not exceeding for each of them, or all the lineal descendants, if any, of each of them, four thousand dollars (later increased by codicil to ten thousand dollars) per year, beginning at the time of my decease. And upon the de-

cease of each of my said five children, without leaving any lineal descendants living at the time of the death of each of them, then said payment of a sum not exceeding (ten) thousand dollars per year, as aforesaid, for each for each year, shall immediately cease."

This clause clearly and unequivocally provided for a *stirpital* distribution of support payments and the will was so construed in *Cassidy, Guardian v. Murray, Trustee,* 144 Me. 326. There were other provisions of the will which preserved absolute equality among the children and as between living children and the lineal descendants of deceased children until the death of the last surviving child. The proponents find it inconceivable that the testator might "shift gears" and suddenly depart from a pattern of rigid equality among family groups to adopt a pattern of equality among individuals. We do not view such a transition as either surprising or unnatural. The testamentary pattern embraced two distinct phases. In the first phase one or more of the testator's children would in a sense be competing for shares. In such case the testator would be concerned lest any child suffer a diminution of his share in competition with the lineal descendants of deceased children. No such consideration would be involved in the second phase in which no child of his would be living to receive his bounty. We think it most natural and normal that the testator, having discharged his obligation to his children, should view his own lineal descendants of equal degree as a new class standing on a basis of individual equality. In short, we are not persuaded that the pattern which the testator adopted for the first phase of his will was necessarily intended by him to constitute the pattern for his entire will.

When we examine the language employed by the testator in the above quoted support payment clause, we note that a *stirpital* distribution was directed with care and precision. The annual payments to each child were to be continued "at

the decease of each of them, then to all the lineal descendants together, if any, *of each of them*" in an amount "not exceeding for each of them, or all the lineal descendants, if any, *of each of them*, (ten) thousand dollars per year." (Emphasis ours.) This language must be compared with that used in the termination clause above quoted in which the testator used the words, "of all of my lineal descendants, if any, then living." It is apparent that although the testator had shown in the support payment clause that he was aware of the language requirements for directing a *stirpital* distribution, no words of similar import appear in the termination clause. This will reflects careful draftsmanship and we view the omission of any clearcut direction of a *stirpital* distribution in the termination clause as significant. See *Mellen* v. *Mellen*, 148 Me. 153, 160 *(supra)*. It is contended that the phrase "lineal descendants" had taken on a meaning in the support payment clause which carries over into the termination clause. In the two phases of his testamentary plan the testator had two distinct classes of lineal descendants in mind. In the support payment clause he was providing only for the lineal descendants of those of his children who should die prior to the termination of the trust. If, for example, the last surviving child had left lineal descendants, they would have had no benefit from the trust. Key words in producing this result were as we have noted the italicized "of each of them." In the termination and final distribution phase the testator's concern was for all of his own lineal descendants, a class or group more broadly based and restricted only by the limitations fixed by the incorporated statute. In short the "lineal descendants" provided for in the support payment clause were by no means intended by the testator to comprise the "lineal descendants" who were to divide the corpus of the estate.

In *Lermond* v. *Hyler*, 121 Me. 54, the will before the court for construction contained the provision, "and after the

death of (a niece) and (a nephew) I give, bequeath and devise all of my property *to my then heirs, as provided by law.*" (Emphasis ours.) There were in fact two other persons who were also named as beneficiaries during their respective lives. Upon an analysis of the testamentary plan, the court concluded that the true intent of the testatrix was not precisely expressed by the language employed in the termination clause. The court interpreted the will as though it had provided that after the death of all of the life tenants the remainder should be distributed to those persons who would have been the heirs of the testatrix if she had died immediately after the death of the last surviving life tenant. The court cited with approval *Proctor* v. *Clark* (1891), 154 Mass. 45, 27 N. E. 673, in which a similar result was reached.

In *White* v. *Underwood* (1913), 215 Mass. 299, 102 N. E. 426, the will provided that upon the death of the life tenant a trust should terminate and the remainder be distributed "among my heirs at law, according to the statutes which shall then be in force." The court held that the statute should be applied as though the testator had died immediately after the death of the life tenant. A like result was reached in *Welch* v. *Howard* (1917), 227 Mass. 242, 116 N. E. 492.

Where a trust terminated at the death of a life tenant, the remainder over was to "those persons to whom it would be distributed and to whom it would pass by descent under the statutes of the State of Maine regulating the descent and distribution of intestate estates." The court held that the statute should be applied as of the date of death of the life tenant and implicitly as though the testator's death had occurred at that time. *Trust Co.* v. *Perkins, et al.*, 142 Me. 363. See also Annotation in 30 A. L. R. (2nd) 406; Restatement of the Law of Property, Sec. 308, Page 1719 *et seq.*

While conceding that the results in the above cited cases are all correct on their particular facts, the proponents contend that a different conclusion must be reached when, as here, the testator uses the words "lineal descendants" rather than the words "heirs" or "next of kin" or similar words importing death.

In Pennsylvania the court had occasion to consider the same problem. A statute provided that a remainder over after a life estate conditioned to vest at the termination of the life estate in the testator's heirs or next of kin or the persons thereunto entitled under the intestate laws "or other similar or equivalent phrase" should be construed as passing to the persons qualifying under the statute as of the termination of the life estate and not to the persons qualifying as of the time of the testator's death. The will before the court for construction vested the remainder over at the termination of a life estate "in (the testator's) lineal descendants according to the intestate laws of the state of Pennsylvania." The court held that the language employed in the will constituted a phrase "similar or equivalent" to the specific expressions found in the statute. *In Re Bonsall's Estate* (1927), 288 Pa. 39, 135 A. 724. We are satisfied that whatever rule of construction would have had application if Mr. Cassidy had made his gift over to his heirs or next of kin as of the time of vesting should have like application where as here he described the ultimate takers as comprising "all of my lineal descendants, if any, *then* living, in the same manner and in the same proportions as shall *then* be provided by the *then* existing laws of the State of Maine *for the descent among lineal descendants* of intestate property, real and personal." (Emphasis ours.)

The proponents direct our attention to the fact that in the original will the above quoted portion of the termination clause was followed by this sentence (later revoked by codicil) :

> "But if at the termination of this Trust, as aforesaid, that is to say after the decease of all of my said five named children, there should not at that time, namely, at the decease of the last survivor of my said five named children, be any of my lineal descendants then living, then, and in that event, all my said estate shall be divided among those persons that shall then constitute my heirs at law, under the laws of the State of Maine, as they shall then exist for the descent of intestate property, real and personal."

The proponents argue that since this clause alone, appropriately phrased, would under the rule in *Lermond* have sufficed to effectuate a *per capita* distribution among the lineal descendants of equal degree, the testator must have had some definite purpose in mind when he provided first for the lineal descendants and then for his heirs at law. This purpose, they contend, could only have been to provide a *stirpital* distribution among lineal descendants. The proponents would read the phrase in the above quoted portion of the termination clause, "of all of my lineal descendants, if any, then living," as though the testator had said, "of all of my *groups of* lineal descendants, if any, then living." We are struck at the outset by the fact that the testator did not use the words, "groups of" or any other equivalent words even though, as already noted, he had recognized the necessity in the support payment clause of making clear a *stirpital* intention. In our view the testator placed his potential heirs in two categories, lineal heirs and collateral heirs. That by his reference to "heirs" in the last sentence of the original termination clause he meant "collateral heirs" finds some support in the fact that when by codicil he revoked this last sentence, he substituted a gift over to his sister who was of course a potential collateral heir. The testator, having resorted to the descent statute for the determination of the takers after the death of his children, may have wished to forestall even the remote possibility that the

statute might be so changed as to destroy the priority afforded to lineal descendants over collateral heirs. The language of his will would preserve that priority for his lineal descendants even though the statute by some later amendment might not.

We can discover no sound or compelling reason for reaching any different result in the construction of this will than was reached in *Lermond* v. *Hyler*, 121 Me. 54 *(supra)*. Certainly Mr. Cassidy did not intend to incorporate by reference portions of the descent statute which would serve no useful purpose in resolving the dilemma for which it was invoked. Since he had called the statute into action to deal with a situation which could only arise after his children had died, it would be incongruous to permit the statute to operate as though at least one child were still living. If on the other hand we apply the rule in *Lermond*, the second sentence of the quoted portion of the descent statute has logical application. As already noted, the sentence reads, "If no child is living at the time of his death, to all his lineal descendants; equally, if all are of the same degree of kindred; if not, according to the right of representation." To effectuate the testator's intention as disclosed by his testamentary pattern, the statute must be applied as though the testator's death occurred immediately after the death of his last surviving child so that the condition that "no child is living" is satisfied. In support of this conclusion we take note of the fact that the legislature itself in enacting the descent statute was providing for two very different situations. In the first sentence of the quoted portion it established the flow of property in cases where children are competing for shares or lineal descendants of more remote degree are competing with one or more children. The legislature provided in the second sentence a very different result to obtain when no children are competing and the takers are all lineal descendants of more remote degree. The latter

situation is the very one for which the testator was providing when he invoked the statute to fix the shares of his own lineal descendants of more remote degree. We are satisfied that it was the future legislative method of resolving this dilemma which the testator desired and intended to employ and adopt as a part of his testamentary plan. He had already provided his own scheme of distribution where his children were involved and required the aid of no legislative plan in so doing.

Both proponents and opponents vigorously assert that the language of the will is clear and unambiguous and requires no resort to outside circumstances to resolve ambiguities. Since, however, the claimants reach diametrically opposite results in their interpretation of this language, we must assume that the will may in some respects be ambiguous and some examination of the background against which it was conceived may not be amiss. At the time Mr. Cassidy executed his will he had no grandchildren. When he executed his codicil he had but one, the present Jane Murphy Sullivan. The marriage of her mother, the then Mary Cassidy, seems to have evoked a storm of protest and disapproval as a result of which the testator virtually cut himself off from any association with either this daughter or her child. Mr. Cassidy never knew his other grandchildren. We think it most unlikely that the testator ever intended that a grandchild who suffered some loss of his affection because of her mother's disregard of his wishes should receive substantially more of his estate than other grandchildren whose parent had never seemingly incurred such marked parental displeasure. We think that it is normal and natural for a testator to think of his prospective grandchildren, yet unborn, in terms of individual equality as recipients of his bounty so long as they are not in competition with any child or children of his. The legislature seems to have made the same assumption in establishing its pattern in the second sentence

of the quoted statute. We find nothing in the attendant circumstances which would tend to resolve any ambiguity in favor of a *stirpital* distribution among the testator's grandchildren.

We conclude that the net estate should be distributed by the trustee among the six claimants *per capita*.

> *Case remanded to the Superior Court for an order for judgment in accordance with this opinion. Costs and reasonable fees to counsel for the trustee and to counsel for the several defendants to be fixed by the sitting justice below and ordered paid by the trustee and charged in his probate account.*